# Case No. 14,042.

## TILGHMAN v. MITCHELL.

[9 Blatchf. 18; 4 Fish. Pat. Cas. 615.]1

Circuit Court, S. D. New York. Aug. 26, 1871.2

PATENTS — EXTENSION — PRELIMINARY INJUNCTION —NOVELTY—APPARATUS FOR DECOMPOSING FATTY BODIES—LICENSE.

1. On a motion for a preliminary injunction to restrain the infringement of a patent which had been extended, although its extension had been opposed by the defendant, on testimony introduced by him, such injunction was granted, it appearing that the novelty of the invention and the validity of the patent had been sustained, on final hearing, in several suits in equity.
[Cited in Goodyear Dental Vulcanite Co. v. Willis, Case No. 5,603.]

2. The construction put in the case of Tilghman v. Mitchell [Case No. 14,043], on the specification of the patent granted to Richard A. Tilghman, October 3d, 1854, for fourteen years from January 9th, 1854, for an "improvement in processes for purifying fatty bodies," approved.

3. If the extension of a patent is regular on its face, no question of irregularity or fraud in granting it can be raised by an infringer, in a suit against him for infringement.
[Cited in brief in Fassett v. Ewart Manuf'g Co., 58 Fed. 365.]

4. Although an inventor obtained a patent in the United States for his invention, after he obtained a patent in England for it, and the English patent expired previously to the granting of an extension of the patent for the United States, the fact that such English patent expired before the patent for the United States was extended, forms no objection to the validity of such extension.

5. The novelty of the invention covered by the said patent to Tilghman, and the validity of the said patent, sustained.

6. The defendant not allowed to give a bond as security, in place of having a preliminary injunction issued against him.
[Cited in McWilliams Manuf'g Co. v. Blundell, 11 Fed. 422.]

1 [Reported by Hon. Samuel Blatchford, District Judge, and by Samuel S. Fisher, Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 9 Blatchf. 18, and the statement is from 4 Fish. Pat. Cas. 615.]
2 [Reversed in 19 Wall. (86 U. S.) 287.]

7. The defendant expressing a willingness to take a license from the plaintiff, under the extended patent, a. the usual rate of license established by the plaintiff, an order was made, that, unless the defendant should accept and execute a license, duly executed by the plaintiff, in the usual form, within ten days, under the extended patent, an injunction should issue, as prayed for in the bill.

[This was a motion for a provisional injunction to restrain the defendant Roland G. Mitchell from infringing letters patent [No. 11,766] for an "improvement in processes for purifying fatty bodies," granted to complainant Richard A. Tilghman, October 3, 1854, for fourteen years from January 9, 1854, the date of a prior English patent, and extended November 23, 1867, for seven years from January 9, 1868. A former suit between the same parties is reported in [Case No. 14,043], and [Id. 14,041]; but as the patent expired during the pendency of that suit, the present bill was filed, accompanied by a motion for a provisional injunction to restrain the defendant during the extended term.] [3]

George Harding, for plaintiff.

Charles M. Keller and Stephen D. Law, for defendant.

BLATCHFORD, District Judge. This is a motion for a provisional injunction, founded on letters patent granted to the plaintiff, October 3d, 1854, for fourteen years from January 9th, 1854, for an "improvement in processes for purifying fatty bodies." The patent was, on the 23d of November, 1867, extended by the commissioner of patents, for seven years from January 9th, 1868. The bill was filed in March, 1871. The defendant is the same person who was the defendant in the suit in equity brought against him in this court by the plaintiff on the original patent, before its extension, and in which suit a decision has just been given by this court [Case No. 14,041], on a hearing on exceptions to the master's report.

The bill sets forth. that a suit in equity was brought, in Ohio, by the plaintiff, in 1859, against one Werk, for infringing the patent; and that a decree was made in it, in 1860 (Tilghman v. Werk [Case No. 14,046]), adjudging that the patent was valid. It also sets forth the bringing of the said suit in this court against the defendant, and the decision therein, on final hearing [Id. 14,043], adjudging the patent to be valid, and that the defendant had infringed it. It also sets forth, that, in 1868, the plaintiff brought two suits in equity in Ohio, one against Werk and others, and one against Shillito, for infringing the patent, as extended; that the defendants in those suits alleged in their answers, in defence, that the extension of the patent was void for want of jurisdiction in the commissioner of patents, and

for want of due publication, and for want of a proper account of profits, and because of fraud and collusion between the plaintiff and the commissioner of patents; that such defendants, also, in their answers, set up, in support of a defence of want of novelty in the invention, various publications and patents, fourteen in number, references to which are specified, so that they can be identified; that such defendants, also, in their answers, alleged that the plaintiff's invention, as described and claimed in his patent, was not useful and practicable, and, in proof thereof, offered in evidence the testimony of one Moinier, a witness residing in Paris, France, which testimony had originally been taken on the reference before the master in such first suit against the defendant in this court, and is on file in this court, and was admitted by consent of the plaintiff to be read in said two suits under the extended patent against Werk and others and Shillito; that the defendants in said two suits examined as witnesses the defendant Mitchell, and his former partner Florence Verdin, to prove the want of novelty, of utility, and of practicability, in the invention described and claimed in the patent; that Werk and Shillito had been examined as witnesses on the part of the defendant Mitchell in such first suit against him in this court; and that said two suits in Ohio, under the extended patent, went to final hearing in May, 1870, and it was decreed that the plaintiff was the original inventor of the invention patented to him, and that the patent and the extension thereof were valid. An affidavit is annexed to the bill, setting forth, that, on the 2d of March, 1871, the defendant was using and working at his factory, in the city of New York, the same process for decomposing fat into fat acids and glycerine by the action of water at a high temperature and pressure, in the Wright and Fouché apparatus, which he had been using for several years previously and since the year 1861; that, in May, 1869, the defendant was decomposing every week about forty thousand pounds of fat into fat acids and glycerine, by the action of water at a high temperature and pressure, in the Wright and Fouché apparatus, by the same process which he had been using since the year 1861; that, in his answer to the bill in such first suit against him in this court, the defendant stated that he was then decomposing fat into fat acids and glycerine by the action of water at a high temperature and pressure, in the Wright and Fouché apparatus, and that the said process of decomposing fats in the Wright and Fouché apparatus, as practised by the defendant, was adjudged by this court, in November, 1864, to be substantially the same, in principle and operation, as that patented to the plaintiff, and to be an infringement thereof.

The defendant opposes the motion on an

answer and on affidavits. The answer avers, that the Ohio suit, of 1859, against Werk, was decided without a full or complete presentation to the court of the state of the art bearing upon the branch of manufacture to which the patent relates, and that such decision is not, and was not, in any manner, conclusive as to the real merits of the issues in said cause; that the first suit in this court against the defendant was decided without a full and complete presentation to the court of all the testimony bearing upon the issues in the suit, and upon the state of the art relating to the branch of manufacture to which the patent pertains; that the defendant, since such decision, has obtained certain testimony as to the practical operation of the alleged invention described in the patent, as applied or demonstrated by the plaintiff, and under his direction, proving its practical inability to produce the results claimed by the plaintiff in his patent; that such testimony is highly pertinent to the issues in said cause, and, if it could have been introduced therein before the final hearing thereof, no decree, on final hearing, such as was made, would have been made, but such evidence would have shown the invalidity of the patent, and would have prevented any decree in the suit against the defendant; that, by the decree in the suit, liberty was given to the defendant to give bond in the penal sum of twenty thousand dollars, with a condition to pay, on final decree, either in this court or in the supreme court, on appeal, all sums of money which might be found due from him to the plaintiff, on an accounting before the master, in which case no injunction should issue against the defendant until a final decree in the cause; that the defendant duly gave such bond in such sum, and has since continued to carry on his business in the same manner as he was doing before the rendering of such decision and the entry of such decree against him, and that the plaintiff has made no application to have such order modified or set aside, or to have any injunction issued; that the master in said suit, under a reference, has reported that no gains or profits have been proven to have been received by, or to have arisen or accrued to, the defendant, from the manufacture, use, or sale of the improvements patented in the plaintiff's patent; that, in such suit against the defendant, the decision of the court was made under a misapprehension on its part as to the mode of operation in the process described in the plaintiff's patent, Mr. Justice Nelson considering that the specification did not require either that the vessel containing the mixture of water and fatty matter was to be entirely filled therewith, or that no steam was to be permitted in it, whereas the specification makes both such conditions necessary; that, except for such misapprehension, the decision would not have been against the defendant; that the report of the master is correct; that the

application for the extension of the plaintiff's patent was not made or proceeded with in conformity with law, and in such a manner as to give the commissioner of patents jurisdiction of the application, and the extension was obtained by fraudulent and deceptive proceedings as against the public, and by collusion between the plaintiff and the then commissioner of patents; that the plaintiff, before obtaining his patent in the United States, had obtained in England a patent for the same invention, which English patent had expired previously to the extension of the patent for the United States; and that no prolongation of the term of the last named patent could legally be granted under the provisions of the law regulating extensions; that, in the suits brought in Ohio, in 1868, the defendants therein did not set up, as a defence, that the extension of the patent was void by reason of want of jurisdiction in the commissioner of patents, and the defences therein set up as to the invalidity of such extension were not urged or argued in the court, on final hearing, and were not considered or passed upon by the judge by whom the suits were decided, and it was not decided by the court that the extension of the patent was valid; that the decision of the court in the two suits brought in Ohio, in 1868, was not founded on the testimony introduced in those suits, and was not a decision on the real merits of those suits, as established by the evidence therein, but such decision was based upon, and declared to be given by reason of, the adjudications previously made in the suit in Ohio, and in the suit in this court; that the judge who rendered the decision declared in it, that he was not at liberty to consider the questions involved, unembarrassed by previous judgments, and that, although the record in the suits, in reference to views which a superior court might take, contained material additional proof, they were not such as to authorize the same court to overrule its former deliberate adjudications, and the cases already decided as to the patent must be followed, and that said judge, after having referred to the defences set up in those suits, used the following language: "I thus briefly advert to the leading objections, solely to show that they are disposed of by the previous cases, and not to discuss them upon principle. Were I at liberty to treat the whole case upon principle, I fear I should be compelled to give the patent a more limited construction than it has received;" that, in those suits, the court refused to order an injunction against the defendants therein, but held that a bond should be received from the defendants; that the plaintiff has never applied to practical use the improvements described in his patent; that, as so described, they are incapable of being applied to practical use; that the patent is void, for the reason that no adequate means are described or shown in the specification

or drawings, whereby the alleged invention can be reduced to practice; that the means of practising such invention, described in the specification and shown in the drawings, and stated in the patent as being, in the belief of the patentee, the best mode of carrying the invention into effect, are pernicious and dangerous, owing to the degree of heat and pressure required, and would also result in the destruction of the glycerine of the fat, and be otherwise impracticable and devoid of utility; that the claim of the patent does not set forth a patentable subject-matter, and that, by reason thereof, the patent is void; that, in view of the state of the art to which the patent pertains, the defendant has a right to use the process he employs, it being a far superior process to that described in the patent, and differing therefrom in principle, in mode of operation, and in effect produced; and that he is now using, and has been using since the 9th of January, 1868, the same process for decomposing fatty acids which he was using at the time of the commencement of the former suit against him, and that he has continually used such process, and has never used any other process. The answer further states, that the defendant has, since the 9th of January, 1868, decomposed fat into fat acids and glycerine by a process or method patented to Wright and Fouché, in which water at a high temperature and under pressure is employed, but an active automatic circulation of the moisture through the fat is provided for, and such circulation is absolutely necessary for the operation of the process, and without such circulation the process would be more expensive than saponification by lime; that the process so used by the defendant differs materially from the process patented to the plaintiff, not only in degree of temperature and pressure, but in the circulation of the moisture through the fat, which is not permitted by the plaintiff's process; that the defendant's process is the same as that referred to in his answer to the bill in the former suit by the plaintiff against him; that the process as employed by him since the 9th of January, 1868, is as follows: The apparatus consists of two boilers connected by two pipes, one of which connects the top of the lower boiler with the upper portion of the upper boiler, and the other connects the bottom of the upper boiler with the lower part of the lower boiler, running through the top of the latter. The lower boiler and a small portion of the upper boiler are filled with hot water, and the remaining portion of the upper boiler is filled to within about two feet of its height, or about ten-twelfths full, with hot fat. Fire is then applied to the lower boiler, and the water subjected to a temperature of about 374° Fahrenheit. The water, being heated, rises, with the steam, through the first-mentioned pipe, to above the surface of the fat, then descends through the fat with the water formed by the condensation of the steam,

to the bottom of the upper boiler, whence it is conducted, by means of the secondly mentioned pipe, to the lower part of the lower boiler; and this process of circulation is continually repeated. The pressure is run up to about twelve atmospheres, and maintained about twelve hours. The boilers used are about two feet in diameter, the upper boiler being about twelve feet in height, and the lower boiler about six feet in height—that the process used by the defendant prior to December, 1860, was substantially as follows: A tank was used, provided with steam pipes fitted with holes, to let the steam enter the tank. Into this tank was put about a foot of water, and into this tank the fat was thrown, and heated by steam, when there was added the milk of lime with a large excess of water. The tank was then covered, and the steaming continued for six or eight hours. This operation being completed, the glycerine produced was drawn off, and the fat acids in combination with the lime shovelled into an adjacent tank and heated by steam, with diluted sulphuric acid. The fat acids thus liberated were then drawn off and settled, and then run into pans to form cakes, which were then subjected to hydraulic pressure, and afterwards pressed in a hot press until all traces of oleic acid were pressed out. Fourteen pounds of lime and twenty-eight pounds of sulphuric acid were used to each hundred pounds of fat—that, since the 9th of January, 1868, the defendant has decomposed into fat acids and glycerine about four and a half million of pounds of natural fat, saving, by the Wright and Fouché process used by him, about six hundred and thirty thousand pounds of lime, and about eleven hundred and sixty thousand pounds of sulphuric acid; that, by the Wright and Fouché process used by the defendant since January 9th, 1868, there may have been two per cent. of fat saved, depending upon the care exercised in obtaining the product; and that the solution of glycerine now obtained by the defendant is of greater strength and purity than that obtained prior to the use by him of the Wright and Fouché process, commenced in December, 1860. The answer then sets up, as establishing the want of novelty in the plaintiff's invention, twenty-one publications and patents. All of these except six were either set up in the answer of the defendant in the former suit against him, or in the answers in the Ohio suits of 1868, or were introduced on the reference before the master in such former suit against the defendant. Those six are the Encyclopédie Roret, of 1849; the French patent to M. Appert, of 1823, in volume 15 of the Brevets d'Invention, of 1828; the 15th volume of the Journal of the Franklin Institute, of 1848; the English patent to William Hawes, of 1839; the English patent to Samuel Guppy, of 1839; and the English patent to Alexander Alliot, of 1851. The answer also avers, that, upon the questions of

novelty, originality, and the prior state of the art, as affecting the validity of the plaintiff's patent and the question of infringement, sixteen of the said twenty-one publications and patents were not cited or offered in evidence by the defendant in the former suit against him, and were not known to the court at the time the decree was made, and that such evidence would have materially affected the decree in the suit.

I must regard the decisions in the three suits in Ohio, and the decision of Mr. Justice Nelson in the suit in this court, followed by the decision on the hearing on the exceptions to the master's report in that suit, and the fact of the extension of the patent, its extension having been, as it appears, opposed by the defendant, on testimony put in by him, as establishing the novelty of the plaintiff's invention and the validity of his patent. So, too, the fact that the use of the Wright & Fouché process is an infringement of the patent, cannot be doubted.

The objection, that the plaintiff's invention, as described in his patent, cannot produce the results claimed in the patent, has been considered and disposed of adversely to the defendant, in the decision given on the hearing on the exceptions to the master's report, in the former suit against the defendant.

The objection, that the decision of Mr. Justice Nelson was made under a misapprehension on his part as to the mode of operation in the process described in the plaintiff's patent, is also without foundation. It is alleged, that Mr. Justice Nelson considered that the plaintiff's specification did not require either that the vessel containing the mixture of water and fatty matter should be entirely filled therewith, or that no steam was to be permitted in it, and that the specification makes both such conditions necessary. On full consideration, I concur in the views of Mr. Justice Nelson on these points, and have no doubt that his interpretation of the specification in regard to them was correct.

As to the validity of the extension, as it is regular on its face, no question of irregularity or fraud in granting it can be raised by an infringer, in a suit against him for infringement. Philadelphia & T. R. Co. v. Stimpson, 14 Pet. [39 U. S.] 458; Stimpson v. West Chester R. Co., 4 How. [45 U. S.] 404; Providence Rubber Co. v. Goodyear, 9 Wall. [76 U. S.] 796; Seymour v. Osborne, 11 Wall. [78 U. S.] 543, 545.

The expiration of the English patent before the patent for the United States was extended, formed no objection to such extension.

In the decision of the court, given by Judge Emmons, in the two suits brought in Ohio, in 1868, he used this language: "Although the record in this case, in reference to some views which a superior court may possibly take, contains some material additional proofs" (beyond those in the previous case in Ohio, and those before Mr. Justice Nelson in the case in this court), "still they are not such as to authorize the same court to overrule its former deliberate adjudications, and to disregard the judgments of a co-ordinate one in a case in all respects substantially like it. Especially is this so where the judge delivering the opinion has taken so leading a part in all the discussions upon this subject in the court of last resort. After much consideration, I am confident that, without a violation of judicial propriety and the best interests of all who pursue or defend here, the cases already decided between these same parties must be followed. It would greatly impair the influence of the court, and the confidence of the suitors, if any succeeding judge turned it into one of appeal for all questions previously decided. Where doctrines are reconsidered, as often they are and should be, the circumstances of the case must be exceptional, and furnish the justification for the action in each instance where it is taken. There are none such in this case. More than ordinary deliberation attended the previous discussions and judgments." These are wise and sound views, and are fitly applicable to the action of this court on the present motion. Nothing is now presented to this court which would authorize it to overrule the deliberate adjudication formerly made by it. That adjudication is fortified by the decisions of the court in Ohio.

The point urged, that the defendant uses a different degree of heat and a different pressure from those set forth in the plaintiff's patent, is considered and disposed of by Mr. Justice Nelson, in his opinion.

In support of the objection that the plaintiff never applied to practical use the improvements described in his patent, and that they are incapable of being applied to practical use, the defendant relies on two letters written by the plaintiff, one dated London, June 25th, 1856, to Thomas Emory & Son, of Cincinnati, and the other dated London, July 20th, 1857, to M. de Fontaine Moreau. But these letters lead to the opposite conclusion. The first letter shows, that the plaintiff had, in factories in London and Paris, exposed the fat and water to a higher heat and pressure for a shorter time, and to a lower heat and pressure for a longer time, and had come to the conclusion that the latter mode of operation was the more convenient one, and had, in connection with it, used an agitator in an ordinary digester; and that he was about putting up at Price & Co.'s works, in London, an apparatus on that plan, capable of treating several tons per day. The lower heat and pressure are within the patent, as has been shown by Mr. Justice Nelson, and the question of the use of an agitator was considered in the opinion given on the hearing of the exceptions to the master's report, in the former suit in this court against the defend-

ant. The second letter shows, that, at the time it was written, the plaintiff's process was being successfully worked in the factory of Price & Co., in London, at a moderately low pressure. In 1860, the plaintiff's process was put into practical use in Cincinnati, in an old form of apparatus. In 1862, it was put into use in Cincinnati, under license from the plaintiff, in another old and different form of apparatus; and, by 1867, ten factories in the United States were working the process under such license. In September, 1860, the defendant was notified by the plaintiff, in writing, not to infringe the patent by using the process he has used, but, in December, 1860, he commenced to practically operate with the Wright and Fouché apparatus, and he has ever since continued to do so.

The defendant, in using the apparatus described by him in his answer as that which he uses, uses the plaintiff's process, and infringes the patent. The process he used down to the time he adopted the plaintiff's process, was the lime saponification process. He now saves the lime and sulphuric acid which he used in that process, and also saves fat, and obtains a solution of glycerine of greater strength and purity. The answer admits, that, up to the time it was put in, the defendant had, since the 9th of January, 1868, decomposed into fat acids and glycerine about 4,500,000 pounds of fat, and saved, by the use of the Wright and Fouché apparatus, about 630,000 pounds of lime, and about 1,160,000 pounds of sulphuric acid. If the price of lime be taken at only $75/100$ of a cent per pound, and the price of sulphuric acid at only 2½ cents per pound, the saving of lime for 40 months would have been $4,725, and the saving of sulphuric acid for the same time would have been $29,000. The saving of fat, at 2 per cent. of the fat worked, would have been 90,000 pounds, for the 40 months, equal, at 12 cents per pound, to $10,800. If the increased profit on glycerine, by reason of its greater strength and purity, be called 1/5 of a cent per pound on the fat worked, such profit, for the 40 months, would have been $9,000. Thus, the defendant may properly be regarded as having saved, in 40 months, by the use of the plaintiff's process, $53,525, or at the rate of $1,338 12 per month. The bases of calculation are those established on the hearing before the master in the former suit in this court against the defendant, and the result shows the direct saving or profit which the defendant is making by continuing his infringement.

The defendant points to nothing in the six publications and patents which his answer sets up, and which had not, in previous suits, been set up or introduced in evidence, which goes to destroy the novelty of the plaintiff's invention, and there is nothing in the other fifteen to justify the withholding of an injunction.

The great merit and value of the plaintiff's invention, not only in the manufacture of candles, but as a process for obtaining pure glycerine for use in the arts, are shown by evidence, and it is quite time that he should have effective protection. After the decision in his favor by Mr. Justice Nelson, on final hearing, a perpetual injunction would undoubtedly have been ordered to issue, as a part of the interlocutory decree, but for some special considerations which induced the judge to suspend the injunction until the final decree, if the defendant should give a bond in $20,000, conditioned to pay, on final decree, either in this court or in the supreme court, all sums of money which should be found due from him to the plaintiff on the accounting before the master, on the filing and confirmation of the report on such accounting. The bond was given and no injunction was issued. If the original term of the patent had not expired, a perpetual injunction would now be ordered, as a part of the final decree. The plaintiff ought to be in no worse position because his patent has been extended, and he is compelled to make the present motion. I see no ground for allowing a bond to be given in this suit, as security, in place of issuing an injunction. The case is a clear one, on all points. Let an injunction issue, according to the prayer of the bill.

When the order for the injunction came up for settlement, the defendant expressed his willingness to take a license from the plaintiff, under the extended letters patent, at the usual rate of license established by the plaintiff. Thereupon, an order was made, that, unless the defendant should accept and execute a license, duly executed by the plaintiff, in the usual form, within ten days, under the extended letters patent, an injunction should issue, as prayed for in the bill.

[On appeal to the supreme court, the above decree was reversed. 19 Wall. (86 U. S.) 287.]